**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| DALE LEHMAN III,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 5:25-CV-02287-DAC<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**MEMORANDUM OPINION & ORDER** |

## INTRODUCTION

Plaintiff Dale Lehman challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry of Oct. 23, 2025). The parties then consented to my exercising jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF #7). For the reasons below, I **AFFIRM** the Commissioner's decision denying DIB and SSI.

## PROCEDURAL BACKGROUND

Mr. Lehman applied for DIB and SSI on April 26, 2023, alleging he became disabled on July 3, 2010. (*See* Tr. 578, 585). After the claims were denied at the initial review and on reconsideration, Mr. Lehman requested a hearing before an Administrative Law Judge. (Tr. 577, 592, 599-60, 627). In July 2024, Mr. Lehman (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 537-60). On October 25, 2024, the ALJ determined Mr.

Lehman was not disabled. (Tr. 35-55). On August 27, 2025, the Appeals Council denied Mr. Lehman's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. §§ 404.981, 416.1481). Mr. Lehman timely filed this action. (ECF #1).

## Factual Background

### I. Personal and Vocational Evidence

Mr. Lehman was 27 years old on his alleged onset date and 41 years old at the administrative hearing. (*See* Tr. 578). He obtained a high school diploma and has worked as a claims representative for an insurance company. (Tr. 752).

### II. Medical Evidence[1]

Mr. Lehman has a long history of back pain. The earliest available records date to July 7, 2010, when Mr. Lehman was 27 years old. (Tr. 869).

**2010**. Mr. Lehman met with Jerome Yokiel, M.D., of the Centers for Comprehensive Pain Care (hereinafter, the Centers) and reported that, starting after a fall a month ago, he had low-back pain with radiation down the left leg. (*Id.*). Before then, he had some back problems, but the pain had "settled down" and he had been doing "fairly well" previously. (*Id.*). The doctor reviewed a recent lumbar MRI showing a disc protrusion at the L3-L4 level and bilateral foraminal narrowing at the L5-S1 level. (*Id.*). On examination, Mr. Lehman was tender in the midline lumbosacral region, reported increasing pain with range-of-motion and straight-leg-raise testing, and had asymmetrical and diminished patellar reflexes and symmetrical and diminished ankle reflexes. (*Id.*).

---

[1] Mr. Lehman only challenges the ALJ's evaluation of chronic pain stemming from his spine impairments. I therefore limit my discussion of the medical records to those relevant to his claims.

Dr. Yokiel assessed lumbar disc displacement and lumbar radiculopathy, prescribed Opana-ER as a long-acting opioid, directed him to continue taking Vicodin for breakthrough pain, and scheduled Mr. Lehman for a series of lumbar epidural steroid injections. (*Id.*).

In August, a lumbar CT showed bilateral spondylolysis at the L3 and L5 vertebrae with minimal spurring to the superior endplate at L4 and mild spurring adjacent to the sacroiliac joints, a diffuse disc bulge at the L3-L4 level effacing the anterior thecal sac with mild bilateral subarticular stenosis, mild bilateral subarticular stenosis at L5-S1, and minimal atherosclerotic calcification involving the iliac vasculature. (Tr. 819).

In September, Mr. Lehman met with Dr. Michael Eppig and reported intense pain in his low-back and buttocks that was not relieved with epidural steroid injections. (Tr. 1273). He explained his pain started in June, and he has not worked since because he cannot sit for two hours at a time. (*Id.*). Dr. Eppig reviewed Mr. Lehman's lumbar CT scan and suggested bilateral pars/facet blocks at L3 and L5 rather than epidural injections. (Tr. 1274). He strongly recommended a dedicated weight loss and fitness program to address Mr. Lehman's morbid obesity and explained that surgery for spondylolysis is "the absolute last option for him." (*Id.*). Dr. Eppig also determined Mr. Lehman needs at least a five-minute break from sitting for every hour he is seated. (*Id.*).

Mr. Lehman returned to the Centers in December 2010 and reported chronic back pain with radiation to the outer thighs. (Tr. 868). He was taking Percocet every four to six hours with partial relief. (*Id.*). Dr. Yokiel noted tenderness to palpation in the midline lumbar region, reported pain with range of motion testing, and intact sensation and motor strength. (*Id.*). Dr.

Yokiel prescribed methadone as a long-acting opioid and continued Percocet. (*Id.*). Mr. Lehman declined lumbar facet injections. (*Id.*).

**2011**. In February, Mr. Lehman again reported chronic back pain that radiates into his legs. (Tr. 867). He had yet to return to work because he could not sit the whole day and his supervisor could not offer an accommodation. (*Id.*). He reported that methadone helps somewhat but does not last the full eight hours, he continues to take Percocet for breakthrough pain, and he takes Flexeril at night for muscle relaxation. (*Id.*). Physical examination revealed typical findings: tenderness to palpation at the midline lumbar region, pain with range-of-motion testing, and increasing pain with straight-leg-raise testing bilaterally. (*Id.*). Dr. Yokiel increased the dosage of methadone. (*Id.*).

Mr. Lehman returned to the Centers in June and reported chronic back pain that radiates to the top of his buttocks, especially with bending. (Tr. 866). He endorsed some pain relief with methadone and Percocet. (*Id.*). He rated his current pain as 5 of 10 on a 10-point scale and examination showed tenderness to palpation over L4-L5 and L5-S1, with normal strength and sensation in the legs. (*Id.*). Certified Nurse Practitioner Jennifer Dehlman assessed lumbar disc displacement and lumbar radiculitis, continued his prescriptions for methadone and Percocet, and referred him to physical therapy. (*Id.*).

By September, Mr. Lehman reported doing well with methadone and Percocet but still endorsed low-back pain radiating down the back of his left leg that worsens with sitting for prolonged times, bending, and in wet or cold weather. (Tr. 865).

In December, Mr. Lehman was evaluated for physical therapy. (Tr. 859-60). He reported low-back pain that limits his ability to sit, stand, walk, bend, lift, and work and he reported deficits

in sleep, self-care, and his abilities to reach, push, pull, lift, carry, squat, and ambulate. (Tr. 859). Physical Therapist Tracy Greb described his gait as slow and antalgic, and she noted a "right side bend" and decreased swing/trunk rotation. (*Id.*). PT Greb determined Mr. Lehman can sit and stand for less than 15 minutes each and walk for less than one hour, lift overhead up to 17 pounds, lift from the floor up to 15 pounds, and carry up to 15 pounds. (*Id.*). PT Greb also determined Mr. Lehman has moderate difficulty with pushing, pulling, and reaching, and severe difficulty with bending. (Tr. 860).

**2012.** Mr. Lehman returned to the Centers in January 2012 and reported continued low back pain (described as tight, sharp, or stabbing) that radiates into his buttocks without numbness or tingling. (Tr. 863). The pain is somewhat alleviated with heat and walking and aggravated by coldness, sudden movements, straining, sitting, and bending. (*Id.*). He was still taking methadone and Percocet without side effects except an occasionally dry mouth. (*Id.*). On physical examination, Registered Nurse Roberta Woodman documented tenderness in the left lumbosacral spine, left buttocks, and left sacroiliac joint; pain with lumbar spine range of motion testing; and intact sensation and strength. Nurse Woodman assessed lumbar disc displacement and lumbar radiculopathy. (*Id.*). She continued his medications and suggested using a TENS unit. (Tr. 864).

**2015.** In December, Mr. Lehman experienced a flare-up of left-sided low-back pain that radiated into his buttocks and left hamstring. (Tr. 1344). He met with George Kellis, M.D., and reported low-back pain that increases with sitting and standing at length and becomes sore after walking. (*Id.*). He described mild-to-moderate improvement with past steroid injections and endorsed taking Tylenol and doing at-home exercises. (*Id.*). He endorsed walking a mile a day and losing 32 pounds. (*Id.*). Dr. Kellis noted Mr. Lehman's report of increased pain with lumbar

extension and improvement with flexion, along with normal motor, sensory, and reflex function. (*Id.*). Dr. Kellis also reviewed imaging showing a 20 degree "curvature apex L3 to the right" and retrolisthesis of L2 on L3. (Tr. 1345). Due to Mr. Lehman's size, Dr. Kellis could not clearly identify any spondylolysis on the films. (*Id.*). He assessed lumbar radiculopathy, low-back pain, and scoliosis and determined "to proceed conservatively" with physical therapy, Advil for pain, a lumbar corset, and continued weight loss. (*Id.*).

**2016**. Mr. Lehman returned to Dr. Kellis' office in May after six months of consistent therapy and exercise without improvement in low-back pain. (Tr. 1346). He also reported paresthesia in both hands and feet. (*Id.*). On physical examination, Dr. Kellis noted positive bilateral straight-leg-raise tests, tightness in the bilateral hamstrings and piriformis muscles, and pain with bilateral Lasegue's sign. (*Id.*). Dr. Kellis ordered a lumbar MRI and prescribed Mobic. (*Id.*).

In August, Mr. Lehman was evaluated for physical therapy. (Tr. 1348). He reported lumbar pain with radicular symptoms into both legs, with pain in the left leg terminating at the foot consistent with L5 dermatomal pattern and pain in the right leg terminating at the posterior hamstring consistent with L4 dermatomal pattern, and intermittent numbness and tingling throughout the same regions. (*Id.*). His typical pain rates as a 6 of 10 on a 10-point scale and sometimes reaches to 10. (*Id.*). His pain increases with bending, excessive use, prolonged sitting, prolonged static posture, repetitive motion, standing or walking more than 15 minutes at a time, turning, and twisting. (*Id.*). The physical therapist documented a stiff gait, moderate tightness in the bilateral lumbar paraspinal muscles, normal strength, positive bilateral straight-leg-raise tests, and diminished range of lumbar spinal motion with pain. (Tr. 1348-49).

Mr. Lehman continued with physical therapy through October. (Tr. 1351-76). He was "able to complete treatment without incident" at every documented therapy session. (Tr. 1351, 1353, 1355, 1357, 1359, 1361, 1363, 1365, 1367, 1369, 1371, 1373). By his third session, Mr. Lehman noted minimal improvement and slight changes to his radicular symptoms. (Tr. 1353). He reported slight improvements with each session and, at the ninth session, described "feeling great." (Tr. 1355, 1357, 1361, 1363, 1365). At the next session, he denied radicular symptoms but reported tension and tightness in the right lumbar region. (Tr. 1367). In late September, Mr. Lehman reported his overall progress "had been minimal and slow," and complained of a burning sensation across his shoulder blades, radicular symptoms in his arms, and a pinching sensation in his low back. (Tr. 1371).

In early October, Mr. Lehman returned to Dr. Kellis and reported no improvement with physical therapy. (Tr. 1375). He described pain radiating into his legs, right arm weakness, hand pain, finger numbness, and some headaches. (*Id.*). On physical examination, Mr. Lehman reported pain along his lumbar spine and Dr. Kellis observed a diminished range of motion. (*Id.*). Dr. Kellis also noted pain with sacroiliac rocking and axial compression, a normal gait with weakness along the left extensor hallucis and along the lumbar paravertebral, painful Lasegue's sign, and spasm along the thoracic spine. (*Id.*). Dr. Kellis assessed lumbar radiculopathy and continued Mobic. (Tr. 1375-76).

Mr. Lehman returned that month for neck discomfort and arm numbness. (Tr. 1386). Physical examination was remarkable for a positive Spurling sign with pain along the trapezius muscles. (*Id.*). Dr. Kellis ordered a cervical MRI and referred Mr. Lehman to Laszlo Harmat, D.O., for carpal tunnel syndrome treatment. (*Id.*).

**2017**. In March, Dr. Kellis evaluated Mr. Lehman and documented spasm along the lumbar paravertebral and normal gait, heel-toe walking, and reflexes. (Tr. 1400). Dr. Kellis recommended he continue with regular exercise and stretching at home. (*Id.*). In August, Mr. Lehman returned and complained of lumbar pain, increased right-hip pain, and new numbness and tingling down the right leg. (Tr. 1402). Dr. Kellis documented positive bilateral straight-leg-raise tests, abnormal gait, and "quite a bit of spasm" to palpation of the lumbar paravertebral. (*Id.*). He recommended Mr. Lehman continue his at-home exercises and stretches and increased his dose of Mobic. (*Id.*).

**2018**. Mr. Lehman returned to Dr. Kellis' office in June for a low-back evaluation. (Tr. 1404). Dr. Kellis documented lumbar paravertebral spasm and reduced range of motion and continued Mobic. (*Id.*).

**2020**. In February, Mr. Lehman met with primary care physician Timothy Neely, D.O., to establish care for multiple issues and conditions, including type 2 diabetes and diabetes mellitus. (Tr. 944). He reported a recent ER visit for chest pain and feeling shaky but denied problems with walking or performing his activities of daily living. (*Id.*). After normal diabetic foot and cardiovascular evaluations, Dr. Neely ordered a stress test and recommended Mr. Lehman lose weight. (Tr. 946).

In August, Mr. Lehman returned for a follow-up appointment and reported worsening back pain, a burning, pinching sensation in his shoulders, and difficulty walking. (Tr. 937). He was not taking anything for pain at the time. (*Id.*). Dr. Neely documented "normal gait and mobility," negative straight-leg-raise testing, normal reflexes, and bilateral paraspinal muscle spasms. (Tr. 937-

38). He prescribed baclofen for shoulder and leg pain, and asked Mr. Lehman to consider using gabapentin for pain control. (Tr. 938).

**2021**. By February, Mr. Lehman was taking gabapentin and still had some numbness. During a telephonic follow-up appointment, he reported not being active. (Tr. 925). Dr. Neely increased gabapentin to twice a day and recommended he lose weight, increase his activity, and stop smoking. (*Id.*).

During his annual physical examination with Dr. Neely in May, Mr. Lehman reported tension headaches, a pinching sensation in his lower back with pain radiating to his right leg, and stiffness and numbness in his legs that worsened with cooler weather, limiting him to shorter walks. (Tr. 915). He was taking baclofen but had not yet started taking gabapentin. (*Id.*). Dr. Neely documented "normal gait and mobility" and bilateral paraspinal spasms. (Tr. 916). He prescribed gabapentin. (Tr. 918).

In November, Mr. Lehman endorsed low-back pain radiating to his right leg with numbness and tingling and a pinching sensation when standing. (Tr. 907). He reported taking gabapentin, baclofen, and Tylenol for pain. (*Id.*). Dr. Neely recommended he exercise and quit smoking. (Tr. 908).

**2022**. At his next annual physical in May, Mr. Lehman reported riding his bike frequently and losing weight. (Tr. 903). Except for bilateral paraspinal spasms, physical examination was normal. (*Id.*). Dr. Neely did not document any report of low-back pain but noted they discussed "advanced rehab" for Mr. Lehman's low back. (Tr. 904).

Mr. Lehman returned in August, reporting headaches and worsening back and right leg pain with numbness though he could still exercise through the pain. (Tr. 898). The findings on

physical examination were largely unremarkable except Mr. Lehman reported pain with right-sided straight-leg-raise testing. (Tr. 899). Dr. Neely ordered lumbar X-rays and an MRI to evaluate Mr. Lehman's radicular symptoms. (*Id.*). X-rays revealed a bilateral pars defect at L3 with associated malalignment at L3-L4 and associated spondylosis with disc space narrowing and marginal spurring anteriorly and posteriorly at L3-L4, mild spurring within the lower thoracic and upper lumbar regions, and lumbar dextroscoliosis that progressed compared to imaging from 2015. (Tr. 952-53). When Mr. Lehman followed up in November, Dr. Neely noted an elevated A1c despite use of metformin and prescribed a GLP-1 injectable medication. (Tr. 894). For back pain, Dr. Neely referred him to Dr. Eppig for a surgical consultation. (Tr. 894).

**2023**. Mr. Lehman followed up with Dr. Neely in February, May, and August. (Tr. 885, 889, 1215). At each appointment, Mr. Lehman endorsed low-back issues but reported not scheduling with Dr. Eppig yet because he had been busy taking care of his ill mother. (*Id.*).

In October, lumbar X-rays showed mild degenerative disc disease at L3-L4 and moderate scoliosis. (Tr. 998). Lumbar MRI imaging, taken in December, showed an unchanged midline disc herniation at L3-L4 with discogenic marrow signal changes in the adjacent vertebral bodies and "moderate/advanced" bilateral foraminal narrowing. (Tr. 1016-19).

**2024**. In March 2024, Mr. Lehman attended a consultation for spine surgery where he reported low-back pain radiating to the right leg in a pattern along the buttock, lateral thigh, crossing over to the groin and anterior thigh, and down to the shin medially. (Tr. 1570). The radiating pain, numbness, and tingling are aggravated by walking long distances and standing in one place and alleviated by sitting and elevating his legs. (*Id.*). He also reported generalized weakness after losing significant weight, noting that his balance feels "off." (*Id.*). The consulting

nurse practitioner observed scoliosis in the lumbar spine and documented mild tenderness in the lumbar spine and paraspinals; periscapular tenderness; normal and symmetrical muscle bulk; generally decreased muscle tone; and normal strength, sensory findings, and reflexes. (Tr. 1575). After reviewing prior MRIs and X-rays, the nurse practitioner determined Mr. Lehman has right-sided radiculopathy due to foraminal stenosis at L3-L4 and decided to continue conservative treatment, ordering updated X-rays and scheduling a transforaminal epidural steroid injection at the L3 nerve root. (*Id.*).

Also in March, Mr. Lehman went to the emergency room twice for palpitations and epigastric and chest discomfort. (*See* Tr. 1054). On April 1, he met with cardiologist Bryan Pace, D.O., for evaluation of shortness of breath, chest pain, hypertension, and dyslipidemia. (*Id.*). After reviewing chest scans from the ER, Dr. Pace ordered an echocardiogram, a stress study, and a Holter monitor. (Tr. 1055). The echocardiogram and Holter tests were normal, and the stress test was negative. (Tr. 1035).

On April 3, Mr. Lehman met with Dr. Kellis and reported cervical spine and shoulder pain and numbness. (Tr. 1410). Dr. Kellis documented "significant sensitivity along the cervical paravertebral muscles with paravertebral spasm," limited range of motion on rotation and side-bending bilaterally, and painful axial compression, and prescribed a short course of steroids for pain relief. (*Id.*). Dr. Kellis then noted Mr. Lehman's underlying problem is related more to his anxiety than a cervical condition. (*Id.*).

On April 7, Mr. Lehman returned to the ER for neck and left shoulder pain for two weeks. (Tr. 1046-47). He reported a headache and anxiety about losing 90 pounds in the last nine months, including muscle mass. (Tr. 1046-47). His physical examination and cervical CT were

unremarkable, except for straightening of the cervical spine "which may be positional or related to muscle spasm." (Tr. 1050). The ER provider noted that his neck spasms could be causing his headaches. (Tr. 1051). After administering injections of Toradol and a muscle relaxer, the ER provider prescribed tizanidine and discharged Mr. Lehman in stable condition. (Tr. 1050-51).

On April 10, Mr. Lehman met with Jamie DelVecchio, D.O., in Dr. Kellis' office and reported pain starting in his abdomen and radiating into his chest and around his back, with some numbness and tingling in the left shoulder occasionally radiating down the arm. (Tr. 1412). On examination, he exhibited chest wall tenderness but no cervical spine tenderness, full range of cervical motion without pain, mild pain with rotation of the thoracic spine, and intact motor and sensory findings. (*Id.*). Dr. DelVecchio ordered an EMG to rule out cervical radiculopathy. (*Id.*).

Two days later, Mr. Lehman again sought emergency treatment for worsening left arm pain and numbness down to the elbow. (Tr. 1037). His physical examination showed normal range of neck motion, no left arm weakness, and intact sensation and motor function. (Tr. 1039). Mr. Lehman received Toradol and steroids for pain and was discharged with a prescription for more steroid medication. (Tr. 1040).

After the EMG, Mr. Lehman was assessed with left carpal tunnel syndrome. (Tr. 1415). He followed up with Dr. DelVecchio on April 19 and reported baclofen reduced his pain. (Tr. 1416). Dr. DelVecchio determined Mr. Lehman had carpal tunnel syndrome but felt the pain was coming from his cervical spine and referred him to physical and chiropractic therapy. (*Id.*).

In June, Mr. Lehman sought treatment at the ER for mid-back and left arm pain that began after he picked up a light laundry basket. (Tr. 1432-33). He reported tightness and pain between his shoulder blades and down the left arm along with numbness and tingling in all

extremities. (*Id.*). His physical examination was unremarkable. (Tr. 1434). He was discharged without a prescription for pain medication because "[over-the-counter] medications [were] appropriate for [his] pain." (Tr. 1437).

A cervical MRI taken July 5 to evaluate neck and left shoulder pain showed "minimal spondylosis" at C5-C6 without significant canal or foraminal stenosis. (Tr. 1461-62).

On July 31, Mr. Lehman met with a Certified Nurse Practitioner at the Cleveland Clinic Center for General Neurology and reported dizziness, left shoulder blade numbness radiating to his left elbow, a pinching sensation in his neck and right shoulder, and intermittent "pins and needles" sensation in the torso, arms, legs, and feet. (Tr. 1587). He also described occasional headaches and imbalance. (*Id.*). The examination was unremarkable. (Tr. 1593). The Nurse Practitioner suspected vitamin deficiency because his symptoms started after significant weight loss, so she ordered lab work and a tilt-table test, prescribed rizatriptan for headaches and gabapentin for neck and back pain, and stressed the importance of physical therapy exercises for neck pain. (Tr. 1593-95).

**III. Opinion Evidence**

Described above, Mr. Lehman was evaluated for physical therapy in December 2011. Physical Therapist Tracy Greb described his gait as slow and antalgic, and she noted a "right side bend" and decreased swing/trunk rotation. (Tr. 859). PT Greb determined Mr. Lehman can sit and stand for less than 15 minutes each and walk for less than one hour, lift overhead up to 17 pounds, lift from the floor up to 15 pounds, and carry up to 15 pounds. (*Id.*). PT Greb also determined Mr. Lehman has moderate difficulty with pushing, pulling, and reaching, and severe difficulty with bending. (Tr. 860).

Dr. Yokiel completed a residual functional capacity (RFC) evaluation form in July 2012 concerning Mr. Lehman's low back pain. (Tr. 879-82). He opined Mr. Lehman can continuously sit and stand for no more than 15 minutes each due to pain, must lie down three times a day to relieve his pain, and can walk between 5 and 10 minutes. (Tr. 880). He also determined Mr. Lehman can frequently reach above his shoulders and at waist level and perform activities involving handling, fingering, and feeling; rarely reach below his waist; frequently lift 11 to 20 pounds; and frequently carry 5 to 10 pounds. (*Id.*).

Dr. Kellis completed a medical source statement in June 2018 concerning Mr. Lehman's low-back pain. (Tr. 1566-69). He opined Mr. Lehman can sit for 5 minutes and stand for 5 to 10 minutes at one time and sit, stand, walk for less than 2 hours total in an 8-hour workday, and requires a job that permits him to shift positions at will, walk around every 10 to 15 minutes for 10 minutes each time, and take unscheduled breaks to relieve muscle weakness and pain. (Tr. 1567). Dr. Kellis also determined Mr. Lehman can never twist and rarely lift less than 10 pounds, stoop, crouch, or climb stairs or ladders. (Tr. 1568). He concluded Mr. Lehman would be off task 25% or more of a workday and absent more than 4 days each month due to his symptoms. (Tr. 1569).

As part of his applications, Mr. Lehman was seen for a physical consultative evaluation in October 2023. (Tr. 964-82). Nurse Practitioner Mary Ann Hayden noted Mr. Lehman walked into the room without difficulty and sat through the assessment with "mild discomfort." (Tr. 968). He reported stiffness and aching in his back, numbness in his legs and feet, and a pinching sensation between his shoulders, for which he took Tylenol and baclofen as needed. (Tr. 964-65). He endorsed bathing, cooking meals, driving, lifting a gallon of milk, and navigating "a couple flights

of stairs" with breaks. (Tr. 967-68). The physical examination was largely unremarkable, with normal muscle strength; normal range of motion in the cervical spine, shoulders, elbows, wrists, hands, fingers, knees, and ankles; diminished flexion in the lumbar spine; and diminished flexion, extension, and abduction in the bilateral hips, causing discomfort in his lower back and groin area. (Tr. 968-82).

In October 2023, state agency medical consultant Leon Hughes, M.D., reviewed Mr. Lehman's medical records and opined he can lift and carry up to 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for about 6 hours each in an 8-hour workday; occasionally climb ramps, stairs, ladders, ropes, and scaffolds; frequently balance; and occasionally stoop, kneel, crouch, and crawl. (Tr. 582, 589).

On reconsideration review in December 2023, state agency medical consultant Steve McKee, M.D., affirmed Dr. Hughes' findings. (Tr. 596-97, 604-05).

**IV. Function Report and Testimonial Evidence**

In July 2023, Mr. Lehman completed an Adult Function Report explaining how his conditions affect his ability to complete his daily activities. (Tr. 769-77). Mr. Lehman first stated he cannot lift more than 10 pounds and cannot sit or stand in place for more than a few minutes before his legs go numb. (Tr. 769). Each day, Mr. Lehman showers, stretches, and then spends the balance of the day "lounging to keep from going numb." (*Id.* or Tr. 770?). In the evening, he gets on his exercise bike for 15 to 20 minutes and then makes dinner, taking breaks from standing as needed. (Tr. 771). He gets 5 to 6 hours of sleep in between tossing and turning. (*Id.*). Mr. Lehman has safety bars in the shower and next to the toilet to grab when his legs get numb and uses furniture for balance when dressing. (*Id.*). He can trim his beard but does not shave and needs

breaks when making meals because he cannot stand for long. (*Id.*). He does household chores like washing dishes and cleaning in 5-minute increments and, on days when he is in too much pain, his girlfriend does the cleaning. (Tr. 772). He does not participate in many social activities because of his conditions but talks or hangs out with others weekly. (Tr. 774). His conditions affect his abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, and get along with others. (Tr. 775). He can walk less than a quarter mile before taking a break and can resume walking after a few minutes. (*Id.*).

One year later, Mr. Lehman testified his right leg goes numb after two minutes of sitting, he has tension headaches at least twice a month, stiffness and pinching in his neck with bending and turning, a burning and pinching sensation in his shoulders, and numbness in his left elbow. (Tr. 543-45, 549). He can stand for 5 minutes before sitting, walk about one block before taking a break, and lift no more than a gallon of milk. (Tr. 553-54). More recently, he has felt dizzy, like he is swaying, and has almost lost his balance while bending over. (Tr. 550). His headaches last between 8 hours and the whole day. (Tr. 551). He cannot function with a headache and must lie down, put heat on his neck, and take Tylenol. (*Id.*). Each day, he gets up and showers, makes coffee, and spends most of the day lying on the couch with his feet up or walking around. (Tr. 546). He occasionally does the dishes and makes easy meals while his girlfriend does most of the other household chores. (Tr. 546-47).

The VE testified that an individual of Mr. Lehman's age and education, who is subject to the limitations the ALJ assessed in her decision, can work as a cashier II, mail clerk, and office helper. (Tr. 555-56). The positions are still available at reduced numbers if the individual needs to alternate between sitting and standing throughout the workday. (Tr. 556-57). The VE also testified

that employers do not tolerate an individual being off task 25% of the workday or missing two days of work each month. (Tr. 558).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?
2. Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?
3. Does the severe impairment meet one of the listed impairments?
4. What is claimant's residual functional capacity and can claimant perform past relevant work?
5. Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this sequential analysis, the claimant has the burden of proof through Step Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do

other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. §§ 404.1520(c)-(f), 416.920(c)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Mr. Lehman had not engaged in substantial gainful activity since July 3, 2010, the alleged onset date. (Tr. 41). At Step Two, the ALJ identified the following severe impairments: diabetes, back pain with minimal spondylosis, obesity, and hypertension. (*Id.*). At Step Three, the ALJ found Mr. Lehman's impairments did not meet or medically equal the requirements of a listed impairment. (Tr. 43). At Step Four, the ALJ determined Mr. Lehman's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R § 404.1567(b) and 416.967(b) except he can never climb ladders, ropes, or scaffolds. He can frequently balance and occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs.

(*Id.*) (cleaned up). The ALJ found Mr. Lehman did not have any past relevant work. (Tr. 48). At Step Five, the ALJ determined Mr. Lehman could perform other work, including as a cashier, mail clerk, and office helper. (Tr. 49). Thus, the ALJ concluded Mr. Lehman was not disabled. (*Id.*).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of

evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can go either way, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not follow its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

## Discussion

Mr. Lehman contends he is disabled due to chronic low-back pain and leg numbness that limit his ability to sit, stand, or walk more than a few minutes at a time and thus cannot sustain full-time employment. (ECF #11 at PageID 1646; *see also* Tr. 548, 552-53). In his merits brief, he emphasizes supporting evidence including Dr. Kellis' opinion that he needs the option to switch between seated and standing positions, will require additional unscheduled breaks, and will be absent more than four days a month; Dr. Yokiel's opinion that he must lie down three to four times during the day; and objective medical findings supporting his consistent reports of pain, including findings of tenderness, positive bilateral straight-leg-raise tests, and limited range of motion with pain. (ECF #11 at PageID 1646-47, 1650).

Mr. Lehman argues substantial evidence does not support the ALJ's RFC because the ALJ did not explain "why she did not factor in sustaining issues into the RFC." (*Id.* at PageID 1647). Reasonably clear from context, "sustaining issues" refers to Mr. Lehman's purported need for additional breaks and absences due to chronic pain. (*See id.* at PageID 1646) ("Regarding sustaining issues, the ALJ does not properly evaluate nor account for Plaintiff's allegations of chronic pain, need for breaks and absences that will occur due to his chronic pain, and the impact

on the ability to sustain gainful employment"). Mr. Lehman also argues the ALJ did not discuss the factors relevant to the evaluation of his symptoms and the evidence the ALJ cited as inconsistent with his statements about his symptoms actually supports his statements. (*Id.* at PageID 1648-51).

When an individual has one or more impairments deemed severe at Step Two, but the impairments do not meet or medically equal the requirements of a listed impairment, the ALJ must identify the individual's functional limitations and assess his remaining capacities for work-related activities, known as the RFC. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also* Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *2 (July 2, 1996). The RFC is an assessment of the most an individual can still do despite his limitations, or more specifically, the extent to which an individual's impairments and related symptoms, including pain, may cause physical or mental limitations or restrictions that affect his capacity to do work-related physical or mental activities. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *see also* SSR 96-8p, 1996 WL 374184, at *2. It is "the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," meaning "8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *2.

The assessment is based on all relevant evidence, including but not limited to information about the individual's symptoms, opinions from medical sources about what the individual can still do, effects of treatment, reports of daily activities, and recorded observations. 20 C.F.R.§§ 404.1545(a)(3), 416.945(a)(3); *see also* SSR 96-8p, 1996 WL 374184, at *2, *5. When assessing an individual's RFC, the ALJ must "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7. The

ALJ must also "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved" and "include a discussion of why reported symptom-related functional limitations and restrictions cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*

As part of the RFC assessment, the ALJ must consider the individual's symptoms, including pain, using a two-step process. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017). First, the ALJ considers whether there is an underlying impairment that could reasonably be expected to produce the individual's symptoms. *Id.*; *see also* SSR 16-3p, 2017 WL 5180304, at *3. If that is established, then the ALJ evaluates the intensity and persistence of those symptoms to determine the extent to which the symptoms limit the individual's ability to perform work-related activities. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 16-3p at *3. To evaluate intensity and persistence, the ALJ considers whether the individual's statements about symptoms and their functional effects is consistent with objective medical evidence, treatment, daily activities, and other evidence. SSR 16-3p, 2017 WL 5180304, at *5-8. The ALJ also considers the location, duration, frequency, and intensity of symptoms; factors that precipitate or aggravate the symptoms; medications and their side effects; treatment and other measures used for pain relief; and any other factor concerning limitations due to symptoms. 20 C.F.R. §§ 404.1529(c)(3); 416.929(c)(3); *see also* SSR 16-3p, 2017 WL 5180304, at *7-8. The ALJ "will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the individual's] statements and the rest of the evidence, including [] history, the signs and laboratory findings, and statements by medical sources and others about how [] symptoms affect [the individual." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). And the ALJ "will

explain which of an individual's symptoms [he] found consistent or inconsistent with the evidence" and how that evaluation led to the ALJ's conclusions. SSR 16-3p, 2017 WL 5180304, at *8.

Here, the ALJ considered Mr. Lehman's alleged limitations, including that he can lift no more than 10 pounds, sit and stand for just a few minutes at a time, and has trouble bending, reaching, kneeling, and climbing stairs, ultimately determining his statements about the intensity, persistence, and limiting effects "are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 44). The ALJ then summarized 14 years of medical treatment, beginning in 2010 with reported low-back pain radiating into the left leg; a lumbar CT scan showing bilateral spondylosis at L3-L5 with atherosclerotic calcification involving the iliac vasculature; and findings of tenderness, painful lumbar range of movement, positive straight-leg raise testing, normal sensation, and normal motor function. (Tr. 44). The ALJ noted similarly mixed findings in June 2011, January 2012, and December 2015. (*Id.*). In May 2016, Mr. Lehman reported tightness in his hamstrings and pain with straight-leg-raise tests, and, in the summer, his physical therapist noted a stiff gait, tenderness of the lumbar spine, slightly reduced strength, and limited range of motion. (Tr. 44-45). Mr. Lehman reported some improvement as he progressed through physical therapy. (Tr. 45).

The ALJ also emphasized other physical examinations in 2018, 2020, and 2021 documenting reported pain with range of motion testing and negative straight-leg-raise tests, normal gait, and intact reflexes. (*Id.*). In 2022, Mr. Lehman endorsed paraspinal tenderness and pain with straight-leg-raise tests, but otherwise had normal reflexes, strength, and gait. (*Id.*). An updated lumbar X-ray showed a bilateral pars defect of L3 with spondylosis, disc narrowing, and

progressing lumbar dextroscoliosis. (*Id.*). In November 2022, Mr. Lehman was referred to a specialist for evaluation and treatment of his back pain but, as the ALJ noted, he did not schedule an appointment with the specialist in 2023 because he was busy caring for his mother. (*Id.*). X-rays and MRIs from 2023 showed moderate scoliosis and mild degenerative disc disease at L3-L4 with moderate/advanced bilateral foraminal narrowing. (*Id.*). The ALJ also noted Mr. Lehman went to the hospital for back pain in March 2024 where physical examinations revealed muscle spasm and limited range of motion but also normal strength, sensation, motor functioning, and neurological functioning. (Tr. 45-46). When Mr. Lehman did meet with the specialist, he exhibited tenderness of the lumbar spine and decreased muscle tone, but also normal strength, sensation, and gait. (Tr. 46). The specialist recommended continuing with "conservative management." (Tr. 1575).

Continuing, the ALJ emphasized other normal examination findings from ER visits in June and, finally, noted the normal examination results from the last available medical record, including intact extremity strength and sensation and normal coordination and gait. (Tr. 46). After summarizing the treatment records, the ALJ concluded as follows:

> Although the claimant had ongoing back pain radiating into his extremities, he had only conservative treatment, with medication, physical therapy, and chiropractic treatment. Despite having continued pain and limited motion, he exhibited generally normal strength, sensation, reflexes, and gait. Such facts indicate that he could perform the reduced range of light work described in the residual functional capacity.

(Tr. 48). Earlier in the decision, the ALJ additionally noted Mr. Lehman "maintained a relationship with a girlfriend," "was able to go out shopping without noted problems," "went shopping and prepared simple meals," and "performed various household chores, including cleaning and washing dishes." (Tr. 42).

Mr. Lehman contends the ALJ cited evidence that corroborates his allegations of disabling pain, including the 2010 lumbar CT scan showing bilateral spondylosis at L3-L5; the findings of the functional capacity examination in 2011; scattered findings of stiff gait, tenderness to palpation, slightly reduced strength, and limited range of motion throughout the record; a lumbar MRI showing "moderate/advanced" bilateral foraminal narrowing at L3-L4; and his visit to the ER in 2024 after picking up a laundry basket. (*See* ECF #11 at PageID 1648). The thrust of Mr. Lehman's argument is that those items of evidence support rather than undermine his allegations of reported pain. (*Id.*) ("In short, the objective testing and clinical[] findings cited by the ALJ in an attempt to support her conclusions in fact corroborate Plaintiff's allegations of chronic pain and significant limitations."). He also asserts the ALJ "failed to properly discuss" his testimony concerning the limits of his daily activities, including that his girlfriend handles most of the household chores. (*Id.* at PageID 1650). He also argues that his consistent reports of pain despite compliance with conservative medical treatment "confirm[s] his allegations should be found consistent with the medical evidence." (*Id.* at PageID 1651). For the following reasons, I find Mr. Lehman has not shown the ALJ erred in concluding that his reported symptoms are not entirely consistent with the evidence or shown that the ALJ's conclusion is not supported by substantial evidence.

Mr. Lehman aptly notes that some of the findings in the medical records the ALJ relies on support his claim that pain limits his functional abilities to a disabling degree, like diminished spinal range of motion and reported tenderness. But that is not a basis on which to overturn the ALJ's decision, because under the substantial-evidence standard, "a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's

factual determinations." *Biestek v. Berryhill,* 587 U.S. 97, 102 (2019) (citation omitted). Under this limited standard of review, a court may not weigh the evidence and decide whether the preponderance of the evidence supports a different conclusion; instead, the court's role is confined to deciding whether substantial evidence supports the ALJ's decision. *See Hatmaker v. Comm'r of Soc. Sec.,* 965 F.Supp.2d 917, 930 (E.D. Tenn. 2013) ("The Court may not reweigh evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion.").

Social Security regulations indicate that clinical findings of "reduced joint motion, muscle spasm, sensory deficit, and motor disruption" are useful indicators that assist the ALJ in making reasonable conclusions about the intensity, persistence, and effects of symptoms on the individual's ability to work. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2). On this record, the ALJ's conclusion that Mr. Lehman's reported pain and functional effects are inconsistent with normal findings in gait, strength, sensation, and reflexes, and inconsistent with the mild-to-moderate findings on X-rays, CTs, and MRIs that do not show nerve root or cauda equina compromise, is a reasonable conclusion–one supported by substantial evidence–even given the existence of other evidence tending to show some reduced range of motion.

Next, I find no error in the ALJ's discussion of Mr. Lehman's daily activities. In various parts of the decision, the ALJ documented Mr. Lehman's daily activities in the record. Drawing from Mr. Lehman's function report, the ALJ noted he can perform personal care on his own, go shopping and prepare simple meals, and complete various household chores like cleaning and washing dishes. (Tr. 42). In the function report, Mr. Lehman also endorsed he can drive, ride in a car, and talk and hang out with friends weekly in person and on the phone. (Tr. 773-74). The ALJ

also noted that in 2023 Mr. Lehman had not seen a specialist to evaluate his back pain because he was busy caring for his mother. (Tr. 45). And she noted Nurse Hayden's comment that Mr. Lehman was able to sit through the consultative examination with mild discomfort. (Tr. 47). Nurse Hayden also documented Mr. Lehman walking into the examination without difficulty after a 45-minute car ride. (Tr. 964, 968). I note here that Mr. Lehman told Dr. Neely in 2020 that he did not have difficulty performing his activities of daily living. (Tr. 945). Substantial evidence supports the ALJ's conclusion that Mr. Lehman's daily activities were inconsistent with his alleged limitations. His abilities to care independently for his personal hygiene, shop without difficulty, prepare simple meals, and complete some household chores indicate he can perform tasks that require some physical exertion. *See Dooley v. Comm'r of Soc. Sec.*, 656 F.App'x 113, 120 (6th Cir. 2016). To the extent Mr. Lehman contends the ALJ erred because he stated his girlfriend handles most of the chores, the argument is not compelling. It is true that his limited ability to do chores or cook meals supports his allegation that he has limitations, but substantial evidence supports the ALJ's conclusion that his ability to perform those daily activities indicates a greater level of functioning than he alleged.

In regard to treatment, the ALJ did not err in concluding Mr. Lehman's treatment was inconsistent with his reported pain. Mr. Lehman appears to acknowledge his treatment was conservative (*i.e.*, limited to medication and physical therapy without surgery) but argues the ALJ "misses the point that Plaintiff has complied with all treatment recommendations trying to improve his symptoms." (ECF #11 at PageID 1649). I recognize that a claimant's compliance with treatment is evidence bearing on the extent and disabling effects of a claimant's symptoms and am sympathetic that pursuing treatment and benefits can be at odds. *See Sias v. Sec'y of Health & Hum.*

*Servs.*, 861 F.2d 475, 480 (6th Cir. 1988); *see also* SSR 16-3p, 2017 WL 5180304, at *9. But the ALJ's decision to discount Mr. Lehman's allegations of disabling pain because he was treated conservatively through medication and physical therapy is proper. *See Kepke v. Comm'r of Soc. Sec.*, 636 F.App'x 625, 638 (6th Cir. 2016) (noting that the plaintiff's "routine and/or conservative treatment for the allegedly disabling impairments" was a proper basis to discount his allegations of pain). Mr. Lehman has not shown error in the ALJ's consideration of this factor.

Finally, Mr. Lehman argues the ALJ did not explain why she did not "factor in sustaining issues into the RFC," referring to limitations opined in the medical opinions of Drs. Yokiel and. Kellis, including the need to shift positions, take unscheduled work breaks, and lie down at least three to four times a day. (ECF #11 at PageID 1646-47). I conclude Mr. Lehman has not shown the ALJ's decision not to adopt those limitations was error.

As part of the RFC assessment, the ALJ must review all medical opinions and explain their persuasiveness. *See* 20 C.F.R. §§ 404.1520c(b), 416.920c(b); *see also Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015). The ALJ considers five factors to determine persuasiveness: (1) supportability; (2) consistency; (3) the source's relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) the source's specialization; and (5) any other factors that tend to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5). The regulations require the ALJ to "explain how [the ALJ] considered the supportability and consistency factors for a medical source's medical opinions," those being the two most important factors. *See id.* §§ 404.1520c(b)(2), 416.920c(b)(2). Supportability is "the extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting

explanation"; consistency is "the extent to which the opinion is consistent with evidence from other medical sources and nonmedical sources in the claim." *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 F.R. 5844-01, 5859, 2017 WL 168819 (Jan. 18, 2017). The ALJ's explanation should "generally include[ ] an assessment of the supporting objective medical evidence and other medical evidence, and how consistent the medical opinion or prior administrative medical finding is with other evidence in the claim." *Id.*; *see also* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) ("we will explain how we considered the supportability and consistency factors"). If the ALJ discusses both supportability and consistency, and substantial evidence supports the discussion, then the reviewing court may not disturb the ALJ's findings. *Paradinovich v. Comm'r of Soc. Sec.,* No. 1:20-cv-1888, 2021 WL 5994043, at *7 (N.D. Ohio Sept. 28, 2021), *report and recommendation adopted,* 2021 WL 5119354 (N.D. Ohio Nov. 4, 2021). Additionally, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, at *7.

In this case, the ALJ determined the opinions of Drs. Yokiel and Kellis were unpersuasive as follows:

> In 2012, Jerome Yokiel, M.D., stated that the claimant could stand for 15 minutes at a time, sit for 15 minutes at a time, and walk for 5-10 minutes. Dr. Yokiel noted that the claimant could rarely bend below waist level and frequently reach above his shoulder, reach at waist level, handle, finger, and feel. Dr. Yokiel noted that the claimant could frequently lift 11-20 pounds and frequently carry 5-10 pounds. The undersigned finds Dr. Yokiel's opinion unpersuasive. While he treated the claimant for a period, the record throughout the relevant period did not establish the degree of limitations in Dr. Yokiel's assessment. Indeed, despite the claimant's ongoing back pain, he had relatively conservative treatment with medication and physical therapy. Moreover, while he had continued pain and limited range of motion, he had generally intact strength and sensation with normal ambulation, which findings are consistent with performing light work as described in the residual functional capacity.

* * *

> Michael Kellis, D.O. said that the claimant could sit for 5 minutes at a time and stand for 5-10 minutes at a time with sitting and standing/walking for less than 2 hours in a workday. Dr. Kellis noted that the claimant had to walk around during the workday, he had to elevate his legs, he could rarely lift less than 10 pounds, and he could rarely stoop, crouch, squat, and climb stairs and ladders. Dr. Kellis concluded that the claimant would be off task 25% or more of the workday and he would miss more than 4 days of work per month. The undersigned finds Dr. Kellis' opinion unpersuasive. Although he treated the claimant, the balance of the evidence did not support his opinion. As noted above, while the claimant had ongoing back pain, he had generally normal strength, gait, and neurological functioning. His other conditions stabilized with treatment. Accordingly, the evidence failed to document the significant degree of dysfunction Dr. Kellis described.

(Tr. 46-47).

The ALJ properly articulated how she considered the persuasiveness of the opinions of Drs. Yokiel and Kellis and adequately explained why she did not include limitations for extra breaks to shift positions or lie down, or for additional absences from work. First, as to both opinions, the ALJ discussed the physical examination findings from across the medical record, emphasizing the provider's own normal findings in gait, strength, and sensation and similar findings in other medical records. The ALJ also discussed Mr. Lehman's conservative treatment with medication and physical therapy as a factor undermining the degree of limitations assessed. Both are proper considerations in assessing the persuasiveness of a medical opinion. *See Wendy D.H. v. Comm'r of Soc. Sec. Admin.*, No. 3:20-cv-387, 2022 WL 621433, at *4 (S.D. Ohio Mar. 3, 2022) (holding that conservative treatment and clinical findings are valid considerations in assessing the persuasiveness of a medical opinion) (citation omitted).

Moreover, the ALJ's discussions provide sufficient explanation for the decision not to adopt limitations affording Mr. Lehman extra breaks and absences. According to the ALJ, and as discussed above, neither the objective medical evidence nor the course of treatment was consistent

with Mr. Lehman's allegations of disabling pain. Dr. Yokiel determined Mr. Lehman would need to lie down during the day to relieve pain (Tr. 880) and Dr. Kellis determined Mr. Lehman would need more breaks due to pain and would be absent from work more than 4 days a month. (Tr. 1567). Considering the ALJ's conclusion that Mr. Lehman's conservative course of treatment and the findings of normal strength, sensation, reflexes, and gait do not support his allegations of disabling pain, I have no difficulty tracing the path of the ALJ's reasoning to not adopt the limitations his providers assessed to address his allegedly disabling pain.

## CONCLUSION

After reviewing the record, the parties' arguments, and the law, I **AFFIRM** the Commissioner's decision denying disability insurance benefits and supplemental security income.

Dated: September 29, 2026

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE